## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| BRYAN KEITH BRINKLEY, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:15CV994 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of

Defendant's final decision denying Plaintiff's applications for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI")

under Title XVI of the Act. For the reasons set forth below, the Court affirms the decision of the

Commissioner.

## I. Procedural History

On June 24, 2013, Plaintiff filed an application for a period of disability and Disability

Insurance Benefits and protectively filed an application for Supplemental Security Income. (Tr.

14, 188-99) Plaintiff alleged that he became unable to work on December 16, 2012 due to

degenerative disk disease, high blood pressure, bulging disk, arthritis, depression, and anxiety.

(Tr. 116, 188, 193) The applications were denied, and Plaintiff filed a request for a hearing

before an Administrative Law Judge ("ALJ"). (Tr. 96-129) On June 9, 2014, Plaintiff testified

before an ALJ. (Tr. 32-80) On October 2, 2014, the ALJ determined that Plaintiff had not been

under a disability from December 16, 2012, through the date of the decision. (Tr. 14-27)

Plaintiff then filed a request for review, and on April 24, 2015, the Appeals Council denied said

request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the June 9, 2014 hearing before the ALJ via video teleconference, Plaintiff was represented by counsel. Upon examination by the ALJ, Plaintiff testified that he had a 10th grade education and was able to read, write, and understand English. Counsel for Plaintiff indicated that he would submit additional medical records and results of an MRI scheduled the next day. The ALJ noted that Plaintiff used a cane. Plaintiff testified that he could not walk more than 15 steps without the cane, which was prescribed by his doctor, a general practitioner. Plaintiff had a driver's license but no longer drove because his legs started going numb, and it hurt to move or twist his neck. Plaintiff stated that when he moved his neck from side to side, pain shot down his spine into his back and hips. (Tr. 34-40)

Plaintiff's counsel provided an opening statement, alleging that Plaintiff should be awarded disability benefits due to several severe conditions, including displacement of the thoracic intervertebral disks, degenerative changes in the thoracic spine, lumbar degenerative disk disease with a congenital partial fusion of T11 to L1, spinal canal stenosis and bilateral neuroforaminal narrowing, numbness and tingling in legs, and depression. Counsel stated that Plaintiff was unable to return to his past work as an auto mechanic, and he was unable to perform any other job on a regular basis. (Tr. 40-42)

The ALJ further questioned Plaintiff, who testified that his wife worked and supported five children. In addition to working as a mechanic, Plaintiff worked for a roofing company and a painting company. However, those jobs were excluded as past work because more than 15

years had passed since he held the positions. Plaintiff worked as an auto technician for Midas, Access Auto, and Big John's between 2003 and March of 2012. (Tr. 42-44)

Plaintiff further testified that he could sit for 15 minutes before needing to switch positions from hip to hip. He sometimes needed to stand up or lay down. Plaintiff opined he could stand for 20 minutes at the most. He could walk 15 to 20 steps without his cane. Plaintiff stated he was unable to crouch or move around on his hands and knees. However, he was able to reach in all directions with both arms. Plaintiff opined that he could lift five to eight pounds with both hands. He could push a grocery cart by leaning on it, but his feet and ankles tingled after walking, standing, or sitting for 15 minutes. He was able to use his hands and fingers. Plaintiff testified that he took blood pressure medication; Zoloft for depression and anxiety; and Gabapentin and a Lidocaine patch for nerve pain. (Tr. 44-48)

Plaintiff explained to the ALJ that he was unable to work due to pain and discomfort. He needed to get up and stretch every 20 minutes, and he could barely focus. In addition, his medications had side-effects which caused drowsiness. Plaintiff stated that he did not shop; instead his wife and children did all the shopping. Plaintiff was able to use a computer but only for about 10 to 15 minutes a day. (Tr. 49-50)

Plaintiff's attorney also examined Plaintiff regarding his impairments. Plaintiff stated that he needed to lay down five to 6 times a day for an hour or two. Further, he testified that he had trouble sleeping at night. He slept only four to five hours, and planned to undergo a sleep study to test for sleep apnea. Plaintiff further testified that the pain in his back and his legs ranged from 7 to 8 daily, on a scale of zero to 10. His pain level increased if he pushed himself too hard or lifted something too heavy. To relieve pain, Plaintiff stretched on the bed or had someone rub his back. He could sit for 15 minutes before needing to get up or lay down for 30

3

to 45 minutes before sitting again. Plaintiff received injections for back pain. He tried physical therapy, but the pain was too severe. He had discussed surgery with his doctor, a neurosurgeon, which would entail replacing his L1 disk in his lumbar region. However, surgeons from Washington University told Plaintiff that they saw a bulging disk in his lumbar region but did not understand why he had so much pain in his back. They recommended that Plaintiff return to his primary care physician. (Tr. 50-54)

Plaintiff further testified that he experienced pain in his legs, more on the right than the left. He used a cane every day over the past year. During a typical day, Plaintiff struggled to get out of bed and needed help getting dressed. He ate something and tried to do a little chore. Plaintiff would take a break and rest for a bit, try to do something else to keep busy, and then take another break. He described his day as going from chair to bed all day. Plaintiff did not perform yard work. He stated that he took medication for depression. He had become more secluded and did not want to go outside. Plaintiff was no longer sociable. He did not go to church or participate in outside activities. He sometimes attended his children's school activities. Zoloft helped his depression but made him drowsy. Plaintiff testified that he experienced 15 to 20 bad days per month due to depression. A bad day included "beating" himself up over not being able to walk, work, or take care of his family. He watched the bills pile up and his life crash around him. Plaintiff felt helpless. (Tr. 54-56)

Plaintiff left his last job as an automobile technician after he went to do a job and felt a pop in his back. The incident occurred December of 2012. Plaintiff received a steroid injection after but quit working when the injection did not help. Plaintiff further testified to experiencing pain in his hips and pelvis every day. The surgeon opined that the pain was due to his L1 disk. Plaintiff was not scheduled to see the surgeon again because Plaintiff did not have adequate

4

insurance or sufficient funds. Plaintiff did not believe he could return to his past work or any other jobs. (Tr. 56-58)

A vocational expert ("VE"), Denise Waddell, also testified at the hearing. The VE testified that Plaintiff previously worked as an auto mechanic, which was a skilled position with a medium exertional level. The ALJ asked the VE to consider Plaintiff's age of 39 on the alleged onset date, 10th grade education, and background. The ALJ also posed a hypothetical question to the VE, asking her to consider a hypothetical person who could lift 20 pounds occasionally and 10 pounds frequently; sit six hours in an eight-hour day; and stand and walk six hours in an eight-hour day. The individual had no limitations on the use of hand and arm controls, foot and leg controls, feeling, fingering, handling, and reaching. However, he had occasional limitations with regard to reaching overhead; climbing ladders, ropes, or scaffold; climbing ramps or stairs; balancing; stooping; kneeling; crouching; crawling; and bending. The individual had no limitations on chemicals, fumes, dust, dog or cat dander, mold, or extremes of temperature. However, he needed to avoid all unprotected heights, hazardous moving machinery, and industrial whole-body vibrations. Nonexertional limitations included simple, repetitive tasks at the unskilled, skilled, or semi-skilled levels; only brief and superficial interaction with the general public, supervisors, and coworkers; and working better with things rather than people. He had no established limitations on concentration, loss of productivity, or routine changes in the work setting. (Tr. 58-64)

Given this hypothetical, the VE testified that the person could not perform Plaintiff's past work, either per the Dictionary of Occupational Titles ("DOT") or as Plaintiff performed it. However, the individual could perform unskilled work at the light exertional level. These jobs included bench assembler, folding machine operator, and collator operator. Her testimony was

5

consistent with the DOT other than the nonexertional limitations. The VE stated that she had 28 years of experience, and the jobs were consistent with the nonexertional portion of the hypothetical. (Tr. 64-65)

The second hypothetical asked the VE to assume a person that could sit for only 15 minutes before needing to change positions; sit for 20 minutes before changing positons; and walk 20 steps without a cane. The sit-stand option would allow the person to stand and stretch at the work station for 15 to 20 minutes without losing productivity and without being off-task. Further, the use of hand and arm controls, foot and leg controls, feeling, fingering, handling, and reaching would be reduced to frequent. The hypothetical individual could never climb ladders, ropes, or scaffold. He could occasionally climb ramps and stairs, balance, stoop, and bend. However, the person could never kneel, crouch, or crawl. The individual had no limitations on chemicals, fumes, dust, dog or cat dander, or extremes of temperature. He needed to avoid all unprotected heights, hazardous moving machinery, and industrial whole-body vibrations. Due to pain and discomfort, the hypothetical person could do only simple, repetitive tasks at the unskilled, skilled, or semi-skilled level. He was occasionally able to do work in the presence of the general public, which was brief and superficial. He could occasionally interact with the general public, supervisors, and coworkers, but he worked better with things rather than people. Further, because of pain and discomfort, the individual would be off task 8 to 10 percent of the workday with a loss of productivity of 8 to 10 percent. He could take normal breaks and only occasionally make routine changes in the work setting. (Tr. 65-66)

In light of this hypothetical, the VE stated that the only remaining job would be bench assembler. The other jobs did not allow for changing of positions. However, the VE cited two new examples of jobs which the person could perform at the unskilled, light level, including

6

electrical assembler and router. The VE based her knowledge of the sit-stand option in these positions on her 28 years of experience in job placement and job analyses concerning these exact jobs. (Tr. 67-68)

In the third hypothetical question, the ALJ asked the VE to assume the person was limited to lifting and carrying eight pounds maximum, five pounds or less frequently. He could sit six hours in an eight-hour day, stand and walk six hours in an eight-hour work day, and utilize the same sit-stand option in the second hypothetical. In addition, the use of hand and foot controls remained at the frequent status, but reaching overhead was limited to occasional. The individual could occasionally balance and stoop; never kneel, crouch, crawl or bend. The ALJ posed the same hypothetical as number two with regard to simple and repetitive work, as well as social interaction. Further, due to pain and discomfort, the person would be off task 14 percent of the time with the ability to make routine changes in the work setting only occasionally. The hypothetical individual required extra breaks to stand and stretch away from the work station that would take him off task 14 percent of the workday with a 14 percent loss of productivity. In response to the hypothetical, the VE testified that the person would not be able to perform any of the jobs previously indicated. (Tr. 68-69)

Counsel for Plaintiff also questioned the VE. To the individual in hypothetical number two, counsel added the limitation of lying down for 45 minutes at a time in addition to regular breaks. The VE stated that such limitation would preclude the identified jobs. Additionally, the VE testified that the most a worker could be off task and keep his job would be 10 percent. Further, an employer would only tolerate one absence per month. (Tr. 70-71)

Plaintiff's attorney then asked the VE to assume a person requiring a sit-stand option every 15 to 20 minutes without a loss of production, and requiring a reduction in occasional

7

postural activities and reduction to frequent fingering for hands, arms, foot, and leg controls. Counsel then asked if the router position could still be performed without the sit-stand option. The VE stated that it could still be performed, as well as the electrical assembler. The ALJ then agreed to hold the record open to allow Plaintiff to submit additional medical records. (Tr. 77-79)

Plaintiff completed a Function Report – Adult on July 8, 2013. He reported that he lived in a house with his family. His condition affected his sleep because he woke up in pain and had difficulty lying in one position. Plaintiff did not prepare meals because he was unable to stand long enough to cook. He did not perform house or yard work due to pain and an inability to walk and stand for a long time. He was able to ride in a car but could not drive or get around easily by himself. He shopped online for gifts. Plaintiff was able to handle money. His interests included watching TV, playing games, watching movies, and listening to the radio. He did not do these things often because his medications caused him to fall asleep or need to lie down. Plaintiff reported that he spent time with others each day watching TV, playing a game, or talking. He went to the doctor on a regular basis. Plaintiff had no problems getting along with others, but he did not feel up to going out because he was in pain. Plaintiff stated that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, complete tasks, and use hands. He could walk 15 steps before needing to rest for 10 minutes. Plaintiff further reported that he was able to pay attention all day and was able to follow written and spoken instructions. In addition, he got along well with authority figures. However, Plaintiff did not handle stress or changes in routine very well. He had become more frustrated, agitated, and upset. (Tr. 237-44)

8

Plaintiff's wife completed a Function Report Adult – Third Party on that same date. She stated that on a daily basis, Plaintiff did not do a lot. He tried to get dressed, ate, used the bathroom, sometimes cried in pain, slept, sat, or lay down. The children cared for the pets. Ms. Brinkley further reported that Plaintiff woke up with pain in his back and hips. She sometimes helped him dress when he was unable to bend. Plaintiff did not prepare meals because standing too long caused pain. In addition, Plaintiff performed none of the house or yard work because he was always in a lot of pain. Ms. Brinkley explained that Plaintiff did not drive because he took pain pills, and it hurt to turn his body. Plaintiff shopped for gifts online, and he was able to handle money. Although he spent time with others every day, Ms. Brinkley reported that Plaintiff had to sit or lay down while he watched TV, played a game, or talked with others. Ms. Brinkley opined that Plaintiff's conditions affected his ability to lift, sit, stair climb, squat, kneel, bend, stand, reach, complete tasks, and walk. He could pay attention and follow instructions very well, but he could not handle stress or changes in routine well. Ms. Brinkley explained that Plaintiff was more frustrated and agitated, and he seemed down or depressed. (Tr. 225-32)

### III. Medical Evidence

On November 28, 2011, Plaintiff saw Stephen G. Smith, M.D., for pain care at the request of his primary care physician. Plaintiff complained of mid back pain that began one month earlier after working on a transmission at work. Dr. Smith assessed thoracic HNP and noted that Plaintiff's MRI showed multilevel degenerative changes in the thoracic spine, most marked at T8-9. Dr. Smith prescribed pain medication and a thoracic epidural injection, and he referred Plaintiff to physical therapy. (Tr. 365-66; 382-83)

Plaintiff presented to his primary care physician, Heather K. O'Toole, D.O., on October 18, 2012 for complaints of left hip pain. Plaintiff stated that he was hit by a golf cart in March

9

and was experiencing sharp pain which radiated into his leg. Over the counter medications provided no relief. Upon examination, Plaintiff had limited range of motion in his left hip and pain with motion. Dr. O'Toole noted tenderness lateral and anterior, with sacroiliac joints and sciatic notches nontender. Straight leg raise, strength, and reflexes were normal. X-rays of the left hip were negative for a fracture, and an MRI showed no evidence of internal derangement. (Tr. 318-27; 349-53)

Plaintiff returned to Dr. O'Toole on December 11, 2012, complaining of left shoulder pain that felt like it was on fire. Dr. O'Toole assessed tendonitis of the left shoulder and advised him to alternate heat and ice. She also advised Plaintiff to see and orthopedist or attend physical therapy if the pain persisted. Dr. O'Toole assessed hypertension and recommended that Plaintiff lower his sodium intake and quit smoking. (Tr. 341-42)

Plaintiff presented for a follow-up appointment on January 7, 2013. He had not monitored his blood pressure and continued smoking every day. Plaintiff voiced no complaints during the visit, and Dr. O'Toole instructed Plaintiff to quit smoking, follow a low salt diet, and exercise. (Tr. 334-35)

On May 14, 2013, Plaintiff's blood pressure was better although still high. He complained of severe anxiety and depression, with irritability, poor sleep, worrying, and nervousness all the time. Plaintiff attributed his depression to unemployment. He reported that nearly every day he had little interest or pleasure in doing things; felt down, depressed, or hopeless; felt tired or had little energy; had poor appetite or overate; felt bad about himself; had trouble concentrating; and moved or spoke slowly or was fidgety and restless. He also stated that he had trouble sleeping or slept too much and that he had suicidal thoughts. Plaintiff experienced extreme difficulty with doing work, taking care of things at home, and getting along

10

with others due to these problems. Dr. O'Toole assessed generalized anxiety disorder ("GAD") and major depression, single episode. She prescribed Zoloft and advised Plaintiff to stop smoking and limit caffeine. (Tr. 328-30)

Plaintiff presented to the ER on May 16, 2013 for complaints of chest pain located in the epigastric area. His ER workup was unremarkable, but Plaintiff was admitted to rule out myocardial infarction. Plaintiff complained of nausea and vomiting, and he reported that he had been working on his car outside in the hot weather and passed out. The examining physician noted that Plaintiff appeared distressed and anxious. However, musculoskeletal exam showed normal range of motion with no edema or tenderness, and his mental status was normal. An echocardiogram and chest x-rays were normal, and Plaintiff was discharged in stable condition. (Tr. 427-61)

On June 27, 2013, Plaintiff returned for management of pain in his mid-back. Plaintiff reported that his pain returned over the last one to two months without any injury or event. Plaintiff had not received physical therapy or chiropractic care. He reported that the thoracic epidural injection in November of 2011 had decreased his pain 100 percent for 18 months. Plaintiff complained of a constant, dull, achy pain in the center of his middle back that did not radiate. He experienced occasional numbness and tingling in the bilateral legs. Activity increased the pain, and heat, rest, and Flexeril decreased the pain. Jennifer Canale, N.P., noted that his physical exam had not changed. She assessed thoracic HNP and prescribed a thoracic epidural injection, continued stretching, and Vicodin. She also referred Plaintiff to physical therapy. (Tr. 367)

Plaintiff underwent a low thoracic epidural injection on July 11, 2013 with no complications or complaints. (Tr. 374-75) However, he presented to the ER that same day for

11

complaints of intermittent chest pain for the past two weeks that increased with movement and was worse after the injection. He was taking Vicodin several times a day. Physical exam revealed focal subxiphoid tenderness in the chest, normal range of motion with some tenderness at the injection area, chest pain on palpation of the injection area, and apprehensiveness. An EKG and chest x-rays were normal, and Plaintiff's diagnoses upon discharge were thoracic back pain and thoracic disc disease. (Tr. 462-71)

On July 25, 2013, Plaintiff returned to Jennifer Canale, N.P., and reported slight improvement after the last injection. He was hopeful that another injection would bring further improvement. Nurse Canale ordered a bone scan and noted that she would consider a thoracic epidural injection. (Tr. 386) A bone scan performed on July 31, 2013 revealed mild scattered degenerative changes with no other abnormality identified. (Tr. 473) On August 22, 2013, Plaintiff reported that his pain was the same and that the injection did not help. He stated that he cried in pain at times and just filed for disability. Nurse Canale referred Plaintiff to a neurologist, Dr. Scodary. (Tr. 387)

On September 6, 2013, David A. Lipsitz, Ph.D., performed a psychological evaluation of Plaintiff. Dr. Lipsitz observed that Plaintiff was cooperative during the session but appeared to be agitated, with difficulty sitting due to back pain. He also walked with an unsteady gait. Plaintiff's chief complaint was back pain due to degenerative disc disease, two bulging discs, and arthritis. Plaintiff reported that he experienced constant pain in his lower back, neck, and shoulders. He was supposed to see a surgeon at the end of the month. His pain affected walking, bending over, pulling, and lifting. However, his moods were okay, and he tried not to get depressed. He complained of anxiety problems but denied any suicidal ideations or impulses. Plaintiff had not received past psychiatric treatment and had never been hospitalized for

12

psychiatric reasons. Plaintiff's interests included being with his five kids and fishing. He spent most of his time at home either sitting in a chair or stretching on the bed because of pain. (Tr. 391-93)

On mental status examination, Dr. Lipsitz observed that Plaintiff was in acute distress. He was very agitated and had difficulty sitting still, with significant back pain. His affect was bright, and his mood was depressed. Plaintiff's intellectual functioning appeared to be within the low average range. He had some memory problems for recent and remote events. His concentration was fair; his insight and judgment were poor; he had difficulty making generalizations based on past social experiences; and he was unable to interpret proverbs. Dr. Lipsitz noted that Plaintiff's thought processes were preoccupied with his physical pain and inability to function in society. Dr. Lipsitz assessed depression secondary to physical illness; disease of the musculoskeletal system, rule out disease of the cardiovascular system; occupational problems and problems with social environment; and a GAF of 50. Dr. Lipsitz opined that Plaintiff needed ongoing psychiatric treatment and medication which would hopefully alleviate the mood disturbance to make a maximal adjustment to his environment. In addition, while Plaintiff could understand and remember instructions, he had difficulty sustaining concentration and persisting with tasks. Plaintiff also had difficulty interacting socially and adapting to his environment. (Tr. 393-94)

In a questionnaire completed that same date, Dr. Lipsitz opined that Plaintiff had marked restrictions of daily activities; moderate/marked difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence, or pace; and unknown repeated episodes of deterioration in a work-like setting. He referred to his report to complete the remaining questions. (Tr. 395)

13

In September and October 2013, Charles W. Watson, Psy.D., and Kevin Threlkeld, M.D., performed consultative examinations by analyzing the medical records through September 2013. Both doctors determined that Plaintiff was not disabled and that he retained the residual functional capacity ("RFC") to perform work. (Tr. 82-110)

Plaintiff began care with Robert Poetz, D.O., on November 5, 2013. Plaintiff wanted to establish treatment with a primary care physician and discuss his hypertension, anxiety, and depression. Plaintiff reported that he was trying to see a neurosurgeon for degenerative joint disease and bulging discs, as he went through pain management without success. Review of systems was within normal limits. Dr. Poetz noted normal gait, adequate muscle tone, and full range of motion of all joints without crepitis or deformity. In addition, Plaintiff's judgment and insight were intact. He had good memory recall and no mood swings or agitation. Dr. Poetz ordered an MRI of the lumbar spine. In addition, he increased Plaintiff's Zoloft dosage, provided low cholesterol diet instructions, and advised Plaintiff to stop smoking. (Tr. 409-12)

An MRI performed on November 14, 2013 revealed L5-S1 degenerative disc disease and degenerative endplate changes with relatively mild bilateral lateral recess stenosis and mild to moderate bilateral neural foraminal narrowing. The report additionally noted congenital partial fusion of T11 to L1. (Tr. 398) Plaintiff returned to Dr. Poetz on December 10, 2013. He reported doing a lot better with Zoloft. However, Plaintiff stated his back pain was intolerable, and he had an appointment with a neurosurgeon in January. Abnormal findings included very tight paraspinal musculature in the lumbar area, as well as tender trigger points over midline and low back. Dr. Poetz assessed unspecified essential hypertension and backache, unspecified. (Tr. 405-06)

14

On March 11, 2014, Plaintiff presented to Dr. Poetz for a sinus infection and for a refill of Hydrocodone and Flexeril. He also requested an MRI to give to Dr. Scodary. Plaintiff reported that his pain was so severe that he could not sleep, and this had been going on since 2011. In addition, he reported pain in his shoulders, neck, hips, pelvis, arms, and feet. He stated walking was difficult due to pain, and he used a cane. On physical exam, Dr. Poetz noted pain in Plaintiff's neck with motion, upper extremity bilateral decreased strength, and pain with motion test. Dr. Poetz prescribed Hydrocodone and counseled Plaintiff regarding an MRI and follow up with the neurosurgeon. (Tr. 401-04)

When Plaintiff returned to Dr. Poetz on May 28, 2014, Plaintiff requested a referral for a sleep apnea test. He also complained of pain in his shoulders and neck. Plaintiff stated that a spine surgeon advised surgery, but Plaintiff was unable to afford it. He sought a refill on pain medications and admitted to taking more than the prescribed amount because his pain was not well-controlled. Plaintiff denied any acute numbness, tingling, or weakness. Physical exam was normal other than antalgic gait and the use of a cane to ambulate. Dr. Poetz assessed backache unspecified; cervicalgia; spinal stenosis unspecified, noncervical; other chronic pain; and other malaise and fatigue. He prescribed new medications and referred Plaintiff to a sleep study. (Tr. 476-78)

On June 5, 2014, Dr. Poetz completed a Medical Opinion re: Ability to do Work-Related Activities (Physical). Dr. Poetz opined that Plaintiff could lift and carry less than 10 pounds occasionally and frequently; stand and walk less than 2 hours; sit less than 2 hours; sit 30 minutes before changing positions; stand 10 minutes before changing positions; and walk around every 20 minutes for 5 minute periods. Dr. Poetz further stated that Plaintiff needed to shift at will from sitting or standing/walking. However, he did not need to lie down at unpredictable

15

times during an 8-hour work shift. Dr. Poetz relied on the medical findings of cane use, back pain, degenerative disc disease, and disc herniation to support the assessed limitations. Further, Dr. Poetz opined that Plaintiff could never twist, stop, crouch, climb stairs, or claim ladders due to back pain, degenerative disc disease, and disc herniation. Plaintiff's impairments also affected reaching, pushing/pulling, and handling because performing these functions caused too much pain, which included back pain and tenderness to palpation. Work-related activities which were affected by Plaintiff's impairments included limits on kneeling and balancing. In addition, Dr. Poetz stated that Plaintiff's symptoms were severe enough to often interfere with attention and concentration required to perform simple, work-related tasks. Dr. Poetz also opined that Plaintiff would be absent from work due to his impairments about two days per month. The symptoms and limitations began 3 to 4 years ago and were expected to last 12 or more months. (Tr. 417-18)

Results of an MRI of the lumbar spine performed on June 10, 2014 revealed developmental fusion at T11-L1 with no acute fracture or acute bone marrow edema; small left lateral disc protrusion at L2-3 with minimal encroachment on the left L2 foramen laterally, of questionable clinical significance; degenerative changes at L5-S1 with mild diffuse annular bulge and facet hypertrophy with mild encroachment at L5 foramen bilaterally; and no other change from 2013. (Tr. 419-20) An MRI of the thoracic spine revealed improvement at T8-9, with resolution of previously identified extruded disc material; and degenerative change with posterior annular bulge at T5-6 and T7-8, which was unchanged. (Tr. 422-23) Finally, an MRI of the cervical spine showed disc herniation at C4-5 and C6-7 resulting in minimal central canal stenosis; and neuroforaminal narrowing at C3-4 through C4-5, at C6-7 and C7-T1. (Tr. 424-45)

16

## IV. The ALJ's Determination

In a decision dated October 2, 2014, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. He had not engaged in substantial gainful activity since December 16, 2012, the alleged date of onset. The ALJ further found that Plaintiff had the severe impairments of multilevel degenerative disc disease and depression. However, Plaintiff did not have an impairment of combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-18)

After carefully considering the entire record, the ALJ found that Plaintiff had the RFC to perform light work. However, Plaintiff needed an accommodation to alternate between sitting and standing/walking in 15 to 20 minute intervals, without becoming off-task or loss of productivity. Further, Plaintiff was limited to no more that frequent use of hand/arm controls, foot/leg controls, feeling, fingering, and handling. He could not climb ladders, ropes, or scaffolds, and he could do no more than occasional reaching, climbing stairs or ramps, balancing, stooping, or bending. The ALJ further determined that Plaintiff could never engage in kneeling, crouching, or crawling. He needed to avoid unprotected heights, hazardous moving machinery, and whole-body industrial vibrations. In addition, Plaintiff was limited to simple, repetitive unskilled as well as skilled/semi-skilled tasks. He worked better with things instead of people, and the ALJ found Plaintiff was limited to no more than occasional brief and superficial interactions with coworkers, supervisors, and the public. He was able to respond to routine changes in the work setting occasionally. However, due to pain and discomfort, Plaintiff would be off-task up to 8 to 10 percent of the workday and experience an 8 to 10 percent loss of productivity. (Tr. 18-24)

17

Based on the RFC assessment, the ALJ found that Plaintiff was unable to perform any past relevant work. In light of his younger age, limited education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy which Plaintiff could perform. Examples of such jobs were bench assembler, electric assembler, and router. The ALJ thus concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from December 16, 2012 through the date of the decision. (Tr. 24-27)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as

18

the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to

19

plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff argues that the ALJ erred by failing to properly analyze the consistent opinions of Plaintiff's treating and examining sources. Plaintiff contends that the ALJ erred in assigning substantial weight to the non-examining agency reviewers because such weight was not supported by good reasons. Plaintiff further asserts that the treating and examining opinions were consistent with and not contradicted by the underlying medical evidence provided by the examining physicians. Defendant argues that the ALJ properly evaluated the medical opinions.

The Plaintiff asserts that the ALJ erred in evaluating the opinion of Plaintiff's treating physician, Dr. Poetz. The ALJ specifically found that "while Dr. Poetz is a treating source, his opinion is not adequately supported by the clinical evidence, and is thus not entitled to controlling weight. Because of the scant rationale provided, this opinion is instead entitled to minimal weight." (Tr. 23) Plaintiff argues that the ALJ failed to provide sufficient support for attributing minimal weight to Dr. Poetz's opinion. Plaintiff maintains that Dr. Poetz found

---

[1]  The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

significant physical limitations, which he supported with specific medical findings and diagnoses. Plaintiff claims that the ALJ had no basis for discounting the opinion. Defendant, on the other hand, argues that the ALJ properly assigned little weight to those opinions because the opinions were internally inconsistent and also inconsistent with other substantial evidence in the record.

The record shows that the ALJ properly considered the all of the medical evidence and properly discounted the opinion of Dr. Poetz. The Court notes that "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, Dr. Poetz listed extreme limitations in the medical questionnaire. (Tr. 417-18) While Dr. Poetz listed Plaintiff's diagnoses as medical support, nothing in the treatment records

supports these limitations. For example, Dr. Poetz based his opinion in part on Plaintiff's use of a cane, yet nothing in the medical records indicates that a cane was prescribed by a doctor. *See, e.g., Kriebaum v. Astrue*, 280 Fed. App'x 555, 559 (8th Cir. 2008) (finding ALJ's adverse credibility determination based upon, *inter alia*, the claimant's use of a self-prescribed cane to be "supported by good reasons"); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (finding the medical records supported the ALJ's RFC findings where, *inter alia*, the medical records and opinions documenting claimant's use of a cane did not state the cane was medically necessary). The ALJ properly noted that Plaintiff used a cane at his own option. (Tr. 22) Further, the ALJ properly found that Dr. Poetz's rationale was simply a recitation of Plaintiff's reported symptoms and diagnoses. The objective testing showed mild, degenerative changes. (Tr. 398, 419-25) In addition, although Dr. Poetz noted some tenderness and pain, he merely prescribed conservative treatment through pain medication, demonstrating that his opinion finding disabling symptoms was not based on objective medical evidence. An ALJ is entitled to give less weight to a treating physician's opinion where it is based largely on the claimant's subjective complaints rather than objective medical evidence. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (citation omitted).

Further, while Plaintiff correctly notes that an ALJ should give consideration to the longitudinal relationship between a treating source and a claimant, the Court notes that Plaintiff saw Dr. Poetz only four times over the course of seven months before Dr. Poetz completed the form. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the ALJ did not err in refusing to give physician's check list or opinion that the claimant could not work where the physician only met with the claimant on three occasions and treatment notes did not indicate the physician had sufficient knowledge to form an opinion about claimant's ability to function in

22

the workplace). Indeed, the ALJ acknowledged this in assigning weight to Dr. Poetz's opinion. (Tr. 22) The Court therefore finds that the ALJ properly evaluated Dr. Poetz's opinion in light of the entire record as a whole and provided good reasons for giving the opinion little weight. *See Rosa v. Astrue*, 708 F. Supp. 2d 941, 954 (E.D. Mo. 2010) (finding the decision not to give controlling weight to treating physician was supported by substantial evidence on the record as a whole where the ALJ identified good reasons for discrediting the opinion).

Plaintiff also argues that the ALJ erred in assigning no weight to the opinion of Dr. Lipsitz. Here, Dr. Lipsitz assessed moderate to marked limitations in Plaintiff's functional abilities. However, as noted by the ALJ, Dr. Lipsitz provided no rationale for these assessments and seemed to rely on Plaintiff's subjective complaints of pain. Further, the ALJ correctly found that none of the clinical observations in the medical record supported Dr. Lipsitz's opinion. (Tr. 23) Dr. Lipsitz noted that Plaintiff's mental issues and depression stemmed primarily from his physical pain. Plaintiff's affect was bright, and he exhibited no evidence of active psychotic functioning or suicidal ideations. Dr. Lipsitz opined that medication and ongoing psychiatric treatment could help alleviate the mood disturbance so Plaintiff could adjust to his environment in light of his physical limitations. (Tr. 393) Later, when Dr. Poetz increased Plaintiff's Zoloft dosage, he reported improvement. (Tr. 405) "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); *see also Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness."). In addition, the record shows that Plaintiff did not seek further psychiatric treatment despite Dr. Lipsitz's prognosis indicating that Plaintiff required ongoing individual psychotherapy. (Tr. 393) "The absence of any evidence of ongoing

counseling or psychiatric treatment or of deterioration or change in . . . mental capabilities disfavors a finding of disability." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citation omitted).

Further, Dr. Lipsitz evaluated Plaintiff on only one occasion. "A single evaluation by a nontreating psychologist is generally not entitled to controlling weight." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (citation omitted). The ALJ may discount a consulting psychologist's opinion where it is based on plaintiff's subjective complaints and not objective findings. *Id.* at 616. Additionally, as previously stated, the ALJ may properly give little weight to an opinion that consists of vague, conclusory statements or is merely a checklist with no elaboration. *Wildman*, 596 F.3d at 964. As the questionnaire completed by Dr. Lipsitz contained limitations far more severe than indicated in the treatment record and failed to include any medical evidence or explanation, the ALJ properly gave those opinions no weight.

Finally, Plaintiff argues that the ALJ erred in assigning substantial weight to the opinions of the state agency consultants Dr. Kevin Threlkeld and Dr. Charles Watson. Plaintiff asserts that the opinions predated Dr. Poetz's treatment and medical opinion; thus the opinions were based on an incomplete record and may not constitute substantial evidence. "As a general matter, 'the report of a consulting physician . . . does not constitute substantial evidence upon the record as a whole . . . .'" *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (quoting *Lanning v. Heckler*, 777 F.2d 1316, 1318 (8th Cir. 1985) (internal quotation and citation omitted)). However, "the Eight Circuit has recognized that a consulting physician may be accorded greater weight in two circumstances: "(1) where it is supported by better or more thorough medical evidence, or (2) where the treating physician's opinion has been properly discredited." *Durfee v. Colvin*, No. 4:13CV385 CDP, 2014 WL 1057216, at *8 (E.D. Mo. Mar.

24

14, 2014) (citing *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations and citations omitted)).

As discussed above, the ALJ properly discredited the opinions of Dr. Poetz and Dr. Lipsitz because they relied on Plaintiff's subjective complaints and not on objective evidence. Further, the opinions from the consultants assessed the totality of the medical evidence prior to Dr. Poetz's treatment. The ALJ then discussed in detail all of the medical evidence, including Dr. Poetz's medical reports. Contrary to Plaintiff's argument that the ALJ failed to properly assess the opinion evidence in the record in determining Plaintiff's RFC, the Court finds that the ALJ's RFC assessment is supported by medical evidence contained in the record as a whole. The ALJ need not rely entirely on a particular doctor's opinion or choose between opinions. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Here, the ALJ properly performed an exhaustive analysis of the medical records and noted the inconsistencies in the record between the treating source's opinions and other substantial evidence. *Id.* at 926. Further, the ALJ properly assessed and discredited Plaintiff's allegations of disability. Therefore, the undersigned finds that substantial evidence supports the ALJ's determination, and Court will affirm the final decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 30th day of August, 2016.

*Ronnie L. White*

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**
